## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ENGINEERING AND SOFTWARE SYSTEM SOLUTIONS, INC., | |
| Plaintiff, | Case No. 23-cv-676 |
| v. | Judge John Robert Blakey |
| GIANLUCA CUSATIS AND CUSATIS COMPUTATIONAL SERVICES, INC., | |
| Defendants. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Over the course of twenty-two years, Plaintiff Engineering and Software System Solutions, Inc. ("ES3") developed a special purpose software—known as the "MARS Software," for use in various research and development projects. Then, in the span of just a few months, Plaintiff's former employee, Gianluca Cusatis, allegedly independently developed a software that mirrors the MARS Software's unique functionality. Plaintiff now sues Cusatis and his company, Cusatis Computational Services, Inc. ("CCS"), for copyright infringement, trade secret misappropriation, and breach of contract. Defendants moves to dismiss all counts for failure to state a claim, *see* [16]. For the following reasons, this Court grants in part, and denies in part, the motion.

A.      **Factual Allegations[1]**

1.      **The MARS Software**

ES3 is the sole and exclusive owner of MARS Software, a "special purpose computational software for simulating the mechanical response of structures under various loading conditions." [1] ¶ 7.  It took ES3 twenty-two years to write and develop the source code[2] for the MARS Software.  *Id.*

Among its "many advanced features," MARS incorporates "the Lattice Discrete Particle Model (LDPM)" and "LDPM pre- and post-processor capability." [1-3].  The "pre-processor takes the user's input of geometry and creates a model that enables the numerical simulation to be performed, and the post-processor takes the output from the numerical simulation and enables the visualization of the results." *Id.* ¶ 7.  The MARS Software "facilitates the solution of specific mechanical engineering problems involving structural break-ups, fragmentation, and post-failure response under extreme loading conditions." *Id.*

Plaintiff uses the MARS Software in its business operations, including in the performance of contracts awarded by the U.S. Army Engineer Research and Development Center (ERDC), a research and laboratory branch of the U.S. Army

---

[1] The Court draws the following facts, presumed true at this stage, from Plaintiff's Complaint [1].  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp., v. Twombly*, 550 U.S. 544, 570 (2007)) (the only issue at this juncture is whether Plaintiff's complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'").

[2] "Source code" is a set of statements and instructions written using a particular programming language. *See* Compendium of U.S. Copyright Office Practices, glossary at 19 (3d. ed. 2021).  After a program is written, these files of source code are converted into executable files, which computers read and process. *See, e.g., Computer Assocs. Int'l v. Quest Software, Inc.,* 333 F. Supp. 2d 688, 692 (N.D. Ill. 2004).

Corps of Engineers. Plaintiff also licenses the software to educational research institutions free of charge. [1-3] at 2.

ES3 registered MARS with the United States Copyright Office under number TXu2-322-892, and "repeatedly marked" the MARS source code with a copyright notice establishing the code as ES3's proprietary material. [1] ¶ 7; [1-3] at 4. The MARS software includes "secret information"—ES3's trade secrets—"including without limitation the pre- and post-processor capabilities," and a "large set of unique models, methods, algorithms, procedures, etc. which perform a variety of functions and capabilities." *Id.* ¶ 8. To guard its trade secrets confidential, ES3 takes several measures, including: limiting access to those trade secrets to only those employees and individuals who directly worked on developing them; requiring employees and individuals with access to the trade secrets to sign agreements containing non-disclosure provisions or restrictive covenants; encrypting data and requiring password protections to further control access; and omitting the portions of the source code containing the trade secrets from the submissions to the United States Copyright Office. *Id.* ¶ 8.

### 2. Dr. Gianlucas Custatis' Tenure at ES3

Defendant Custatis used the MARS Software from 2003 to 2019 to work on mathematical models and computer simulations, first as a university researcher, and later as an ES3 employee. [1] ¶ 9. During this time, Dr. Cusatis gained familiarity with the capabilities and commercial applications of the MARS Software, "while

3

gaining the trust and confidence of Plaintiff's key officers, including Daniele Pelessone, Plaintiff's Chief Scientist." *Id.*

In August 2017, Plaintiff hired Dr. Cusatis as an employee to assist with an ERDC contract. *Id.* ¶ 10. At this time, he signed a Confidentiality Agreement, pledging not to "directly or indirectly disclose or use ES3's confidential information,"[3] except pursuant to his employment and for the benefit of ES3. [1-3] at 4.

Around June 2018, Dr. Cusatis asked ES3 to exclusively license and transfer ownership of the MARS Software to him, so he could independently modify, promote, offer for sale, and sell the MARS Software. *Id.* ¶ 11; [1-3] at 3. ES3 rejected Cusatis' proposal, maintaining that ES3 would remain the sole owner and developer of the MARS Software. [1-3] at 4. Despite this, later that month, Dr. Cusatis asked for— and received, subject to his Confidentiality Agreement—a copy of the MARS source code to assist him in "performing his duties as an employee." [1] ¶12.

### 3. The "MARS Derivative"

Dr. Cusatis left ES3 in July 2019, by mutual agreement, when the ERDC contract ended. *Id.* ¶ 13. On November 1, 2019, Dr. Cusatis informed ES3 via email that he removed the MARS Software source code from his computer. *Id.* ¶ 14. ES3 alleges that, some time in 2019, Dr. Cusatis began developing a software program (the "MARS Derivative") with capabilities similar to ES3's MARS Software; Plaintiff

---

[3] The Agreement defines "Confidential Information" as "any and all trade secrets and any and · all data or information not generally known outside of the Company whether prepared or developed by or for the Company or received by the Company from any outside source," including without limitation, "any customer files, customer lists, any business, marketing, financial or sales record, data, plan, or survey; and any other record or information relating to the present or future business, product, or service of the Company."[1-2] at 2.

alleges that Cusatis "improperly copied and inserted and or utilized portions of the MARS Software source code, including without limitation the Trade Secrets, into the MARS Derivative." *Id.* ¶ 14.

ES3 alleges that Cusatis prepared a progress report in connection with an ES3 ERDC contract using the MARS Derivative; in particular, that report included a figure (Figure 10), which could not have been generated without LDPM pre- and post-processors. [1] ¶ 18; [1-3] at 3. No software on the market other than MARS had the ability to generate that figure. [1] ¶¶18–19; [1-3] at 3. As a result, during a conference call with the ERDC, Plaintiff's Chief Scientist "repeatedly" asked Dr. Cusatis to explain how he created the figure, and eventually Dr. Cusatis claimed he used software he had created. [1] ¶ 18. Plaintiff alleges that, because the MARS software's unique capabilities took more than twenty years to develop, Dr. Cusatis, "simply could not have developed the LDPM pre- and post-processor scripts to interface with Abaqus from scratch in a few months without making use of the MARS code." [1-3] at 3. Plaintiff claims Dr. Cusatis "used, copied, modified, and inserted" portions of the MARS Software source code, including the pre- and post-processor capabilities, into the derivative software. [1] ¶25. And Dr. Cusatis' failure to provide a substantive explanation for how he generated the figure in the report has only furthered Plaintiff's belief that he and his company are using portions of the protected MARS source code in their software. [1] ¶¶18–19; [1-3] at 4.

Dr. Cusatis and CCS have also published at least two articles with the American Society of Civil Engineers that ES3 claims use and disclose the confidential

information, data and technology that Plaintiff shared with Dr. Cusatis while he was an employee. *Id.* ¶¶ 17, 22. This confidential information includes: (i) material regarding the 3-D printing of concrete, which Dr. Cusatis developed during his employment at ES3; and (ii) any unpublished algorithms contained in the MARS source code. [1-3]. Neither Defendants, nor any third party, followed protocols to claim rights in the work; sought permission to publish the information, data or technology; or claimed any interest in the information, data and technology. [1] ¶ 22.

On July 14, 2022, Plaintiff sent a letter demanding that Dr. Cusatis cease and desist his unauthorized use or sale of any software that incorporates MARS source code or any derivative thereof and his disclosure of "ES3's confidential and proprietary information." *Id.* Defendants did not respond. [1] ¶ 21.

### 4. Procedural History

Plaintiff sued Dr. Cusatis and CCS on February 23, 2023, alleging copyright infringement (Count I); misappropriation of trade secrets in violation of the Defend Trade Secrets Act, and Illinois and California state law (Counts II, III, and IV), and breach of the Confidentiality and Non-Competition Agreement (Count V). *See* [1]. Defendants move to dismiss all counts under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1). *See* [16].

### B. Applicable Legal Standards

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) a complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed. R. Civ. P. 8(a)(2), and giving the defendant "fair notice" of

the claim, as well as "the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must contain "sufficient factual matter" to state a facially plausible claim to relief—one that "allows the court to draw the reasonable inference" that the defendant committed the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A motion to dismiss should be granted only if it appears beyond doubt that plaintiff can prove no set of facts entitling him to relief. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 432 (7th Cir.1993); *Pickrel v. City of Springfield, Ill.*, 45 F.3d 1115, 1118 (7th Cir.1995).

The standard for a Rule 12(b)(1) motion differs from the above standard only in that the Court "may properly look beyond the jurisdictional allegations" and "view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Apex Digital, Inc. v. Sears, Roebuck &* Co., 572 F.3d 440, 444 (7th Cir. 2009). On a Rule 12(b)(1) motion, the plaintiff must establish that the jurisdictional requirements have been met. *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586 , 589 (7th Cir. 2014). If the defendant raises a serious doubt about jurisdiction, then the plaintiff must support its facts by competent proof. *Selcke v. New England Ins. Co.*, 2 F.3d 790, 792 (7th Cir. 1993) (citing *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942)); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, (1992); *Kontos v. U.S. Dept. of Labor*, 826 F.2d 573, 576 (7th Cir. 1987)).

Under both Rule 12(b)(1) and Rule 12(b)(6), the Court must construe the complaint in the light most favorable to ES3, accept all well-pleaded facts as true,

and draw all reasonable inferences in its favor. *Yeftich v. Navistar*, Inc., 722 F.3d 911 , 915 (7th Cir. 2013); *Long v. Shorebank Dev't Corp.*, 182 F. 3d 548 , 554 (7th Cir.1999). But the Court need not accept the complaint's legal conclusions as true. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009); *Yeftich*, 722 F.3d at 915.

In ruling on the motion, the Court may consider the complaint itself, documents attached to the complaint, documents central to the complaint and to which the complaint refers, and information properly subject to judicial notice. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). The Court may also consider additional facts set forth in the non-movant's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings.*" Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

## C.      Discussion & Analysis

Defendants move to dismiss all claims for substantive reasons. Defendant CCS also moves to dismiss the claims against it specifically. The Court discusses the parties' arguments below.

### 1.      Count I:  Copyright Infringement

Defendants seek to dismiss ES3' copyright infringement claim based upon both Rule 12(b)(1) and Rule 12(b)(6). Before considering whether ES3 has alleged sufficient facts to make out a plausible copyright infringement claim, this Court must determine whether it has jurisdiction to hear it.

8

### a. Subject Matter Jurisdiction

Defendants first argue that ES3's copyright claim "arises out of activities that allegedly took place in connection with a contract with the United States Government Army Corps of Engineers." [17] at 2 (citing [1] ¶¶ 14, 16, 18). As a result, Defendants argue, this Court lacks jurisdiction to hear it.

The Court of Federal claims has exclusive jurisdiction over copyright infringement claims brought against corporations "owned or controlled by the United States" or against "a contractor, subcontractor, or any person, firm, or corporation acting for the Government and with the authorization or consent of the Government." 28 U.S.C. § 1498(b). As a result, district courts readily dismiss copyright infringement suits against entities owned or controlled by the United States government. *See, e.g.*, *Shoemaker v. U.S. Dep't of Just.*, 121 Fed. Appx. 127 (7th Cir. 2004) (dismissing infringement claim against multiple United States government agencies); *Brewster v. United States*, 958 F.2d 374 (7th Cir. 1992) (same against NASA). When a party sues a private party acting as a federal government contractor, however, § 1498's jurisdictional bar applies only when that third party was acting for the government and with the government's authorization or consent.[4] *Boyle v. United States*, 200 F.3d 1369, 1373 (Fed. Cir. 2000) (citing *Auerbach v. Sverdrup Corp.*, 829 F.2d 175 (D.C. Cir. 1987), *cert. denied,* 485 U.S. 905 (1988)).

---

[4] The Seventh Circuit has not directly addressed copyright suits against private parties acting as government contractors under § 1498(b). But, when interpreting this "rarely construed waiver of immunity by the federal government," other courts consistently look to the D.C. Circuit's comprehensive analysis of the statute in *Auerbach*, 829 F.2d at 178. *See, e.g., Jetform Corp. v. Unisys Corp.*, 11 F. Supp. 2d 788, 791–92 (E.D. Va. 1998) (following *Auerbach*'s reasoning); *Boyle*, 200 F.3d at 1373 (same).

The existence of a contract between the federal government and a private party alone does not establish the federal government's authorization or consent to copyright infringement. *See, e.g., Auerbach*, 829 F.2d at 179–81 ("Manifestly, the government in this statute is not obligated to act as an insurer for the infringement actions of any third party acting for the government.").  A defendant government contractor attempting to dismiss a § 1498(b) copyright infringement case must demonstrate the government's intention to accept liability for the specific act. *See Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 198–99, 198 n. 7 (D.C. Cir. 1992) (listing examples).

The defendant infringer's authorization or consent from the United States government for copyright infringement may be either express or implied. *Id.* at 198–99.  In *Herbert*, the district court found the government had authorized the copyright infringement even without an express contractual provision, where the government agency received two letters from the plaintiff notifying it of the defendant's alleged infringement and offered the defendant the option to submit the infringing report anyway. *Id.* at 199; *see also Auerbach* 829 F.2d at 177 (denying motion to dismiss where no express contractual provision authorized or assumed liability for the defendant's use of the plaintiff's copyrighted work and no other evidence existed showing the government knew about the work and wanted it copied).

Similarly, in *4DD Holdings, LLC v. United States*, a copyright owner of software licensed to the federal government filed an action for copyright infringement against the government after its contractors copied and installed the software in

excess of the license. 143 Fed. Cl. 118 (2019). The court concluded that the federal government authorized and consented to the contractor's actions by directing the contractor to engage in actions that necessitated copying the software program, approving the contractor's plan to copy virtual machines containing the software program, and contractually accepting liability for the contractor's excessive use of the software program. *Id.*

Nevertheless, the mere fact that the government benefits from the alleged infringement by accepting contracted goods or services, without more, is not enough to establish authorization or consent. *Jetform Corp.*, 11 F. Supp. 2d at 792. *See also Auerbach*, 829 F.2d at 180 (holding "the fact that the federal government might benefit from the defendant's copying of architectural plans because it subsequently will have ownership of the building does not make the United States a party to the copyright violation"). In *Jetform*, for example, a software manufacturer brought an infringement action against its licensee, a government contractor providing the plaintiff's software product to the United States Coast Guard, for failing to comply with the terms of its license. *Id.* at 791. The district court denied the contractor's motion to dismiss for lack of jurisdiction, concluding that the government's acceptance of allegedly infringing software did not by itself signify authorization of infringement.

Here, the Complaint alleges the existence of a government contract (specifically with the United States Army Corp of Engineers) naming Plaintiff as the primary contractor, Northwestern University as a subcontractor, and Dr. Cusatis (a

Northwestern Professor) as principal investigator for Northwestern. [17] at 9, 13; [23] at 2. The existence of this contract alone, however, does not demonstrate the government's consent or authorization; nor do the facts underlying the claim. In fact, ES3 is not alleging that it suffered harm because of Dr. Cusatis' work on that particular government contract; rather, the contract remains relevant only because the February 2020 progress report that triggered ES3's submissions regarding Cusatis' misconduct happened to be submitted in connection with the contract. The fact the government may have received some benefit from the progress report containing Figure 10 similarly falls short of demonstrating government authorization or consent. The current record provides no basis to find that the government commissioned the development of the alleged MARS Derivative or intended to accept liability for Dr. Cusatis' unauthorized use of the MARS Software. To be sure, Defendants have offered nothing to suggest that the government instructed Dr. Cusatis to copy, modify, or insert portions of the copyrighted MARS Software source code into the alleged MARS Derivative, or to use the MARS Derivative in connection with his publications or progress reports. *See* [1] ¶¶ 25–27; [23] at 8. And the cases Defendants cite do not help them.[5]

---

[5] For example, in *O'Rourke v. Smithsonian Institution Press*, the court dismissed, not because it found the government had authorized or consented to the infringing activity of a private party, but because it found that the Smithsonian Institution was an "instrumentality of federal government" entitled to sovereign immunity for purposes of § 1498(b). 296 F.Supp.2d 434, 435–36 (S.D.N.Y. 2003) *aff'd,* 399 F.3d 113 (2d Cir. 2005). Likewise, in *Zaccari v. Apprio, Inc.*, the district court dismissed the plaintiff's copyright infringement claim against its former employer because the government submitted a statement to the court showing that it consented to accepting liability for the actions of the defendant-contractor. 390 F. Supp. 3d 103, 111 (D.D.C. 2019). And, in *Zaccari v. Discover Techs. LLC*, the court dismissed the copyright claim against the private government contractor because the alleged conduct by the government extended "well beyond the mere acceptance of goods." 2018 WL 6834362, at *1 (E.D.

Likewise, the record contains no allegations that Defendants qualify as a government entity, nor does it contain any express statements from the government accepting liability or specific actions by the Army Corp of Engineers endorsing the alleged copyright infringement. Indeed, conducting the fact-intensive determination of whether Defendants were acting with implied "authorization and consent of the government" remains inappropriate at the motion to dismiss phase. *See Auerbach*, 829 F.2d at 180 (explaining such evidence must be submitted to *the trier of fact* for evaluation of its sufficiency); *see also Williams v. Columbia Broad. Sys., Inc.,* 57 F. Supp. 2d 961, 966 (C.D. Cal. 1999) (explaining that "where a private party is a defendant, section 1498 does not lend itself to determination on a jurisdictional motion").[6] In short, based upon the pleadings, federal subject matter jurisdiction

---

Va. Dec. 28, 2018). Unlike here, the government project team renamed the copyrighted software for its own use, collaborated with the defendant to attempt to create a similar application, and when that was unsuccessful, deployed a substantially similar version of the software to thousands of government employees. *Id.* at *4. Defendants' remaining case, *Astornet Techs. Inc. v. BAE Systems, Inc.*, a patent infringement case brought against private entities acting as government contractors, was dismissed on the pleadings so that the case could proceed in the Court of Federal Claims because the claims of indirect infringement by the contractors depended upon proof of direct infringement by a government agency. 802 F.3d 1271, 1277 (Fed. Cir. 2015). None of these cases applies here.

[6] As Plaintiff asserts, some courts have held that, in litigation between private parties, § 1498 acts as an affirmative defense, rather than a jurisdictional statute. *See* [23] at 8 (quoting *Toxogon Corp. v. BNFL, Inc.*, 312 F. 3d. 1379 (Fed. Cir. 2002)). But there is considerable disagreement among federal courts over whether § 1498(b) is an issue of federal subject matter jurisdiction or an affirmative defense when invoked by private parties. *See Herbert*, 974 F.2d at 196 ("The question of whether § 1498(b) is only an affirmative defense is not itself free from doubt."); *see also Serra v. U.S. Gen. Servs. Admin.*, 667 F.Supp. 1042, 1051 (S.D.N.Y.1987), *aff'd* 847 F.2d 1045, 1051 (2d Cir. 1988) (treating § 1498(b) as jurisdictional). When *patent* suits are brought between private parties, the Federal Circuit has allowed the private party-defendant to assert an affirmative defense under § 1498(a) that it had acted on orders of the government. *See Madey v. Duke Univ.*, 307 F.3d 1351, 1360 (Fed. Cir. 2002) (Federal Circuit law . . . teaches that § 1498(a) is an affirmative defense and is not jurisdictional."); *Manville Sales Corp. v. Paramount Sys.,* Inc., 917 F.2d 544, 554 (Fed. Cir. 1990) ("The Supreme Court has established that section 1498(a) is to be applied, at least with respect to suits to which the United States is not a party, as a codification of a defense and not as a jurisdictional statute.") (citing *Sperry Gyroscope Co. v. Arma Eng'g Co.*, 271 U.S. 232, 235–36 (1926)). The Seventh Circuit is silent on this issue but has treated other statutory waivers of sovereign immunity as affirmative defenses. *See e.g.,*

exists, and this Court declines to dismiss for lack of subject matter jurisdiction based upon the current record.

### b.    Sufficiency of the Allegations

Turning to the sufficiency of ES3's copyright infringement allegations, the Copyright Act grants the owner of a copyright the exclusive right to prepare derivative works based upon the copyrighted work. 17 U.S.C. § 106(2); *Pickett v. Prince*, 207 F.3d 402, 405 (7th Cir. 2000). To state a claim for copyright infringement, the Plaintiff must show: (1) "ownership of a valid copyright"; and (2) "copying" of the copyrighted work's protected elements.[7]  *Peters v. West*, 692 F.3d 629, 632 (7th Cir. 2012) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).

Because Plaintiff's copyright in the MARS Software is registered with the United States Copyright Office, [1] ¶ 7; [1-1], this Court assumes without deciding that ES3 owns the software and the software is entitled to copyright protection (that is, it was created independently and satisfies the Copyright Act's minimal originality requirement). *See* 17 U.S.C. § 410(c) ("In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall

---

*Stewart v. United States*, 199 F.2d 517, 520 (7th Cir. 1952) (waiver of sovereign immunity in the Federal Tort Claims Act); *cf. Connell v. KLN Steel Prod. Ltd.,* No. 04-194, 2009 WL 691292, at *11 (N.D. Ill. Mar. 16, 2009) (applying 1498(a) as affirmative defense). In any event, the distinction remains "more academic than practical" at this early juncture. [24] at 12 (quoting *Croydon Co., Inc. v. Unique Furnishings Ltd.*, 831 F. Supp. 480, 486 (E.D.N.C. 1993)). Dismissal on this basis remains inappropriate.

[7] Defendants' formulation of the rule notwithstanding, *see* [17] at 10, Plaintiff need not prove that the defendant's copying was *unauthorized* to state a prima facie case of copyright infringement. *See Muhammad-Ali v. Final Call, Inc.*, 832 F.3d 755, 760 (7th Cir. 2016) (collecting cases). Instead, the burden is upon the alleged infringer to show that the use was authorized. *Id.* at 761; *Chamberlain*, 381 F.3d at 1193 ("[U]nder Seventh Circuit copyright law, a plaintiff only needs to show that the defendant has used her property; the burden of proving that the use was authorized falls squarely on the defendant.").

constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."); *Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1099 (7th Cir. 2017) (citing *Feist*, 499 U.S. at 346); *Design Basics, LLC v. Signature Constr., Inc.*, 994 F.3d 879, 886–87 (7th Cir. 2021); *Peters*, 692 F. 3d at 634. To satisfy the second element of its claim, Plaintiff must allege as a factual matter that Defendants "actually copied" its work. *Signature Constr.*, 994 F.3d at 887 (quoting *Lexington Homes*, 858 F.3d at 1099). Ultimately, because direct evidence of copying is rarely available, a plaintiff may prove copying by showing that the defendant had "access" to the plaintiff's copyrighted work and the two works are "substantially similar." *Peters*, 692 F.3d at 633; *see also Selle v. Gibb*, 741 F.2d 896, 900 (7th Cir.1984) (quoting 3 Nimmer on Copyright § 13.02).

Here, Defendants argue that Plaintiff's copyright claim fails to plausibly allege that Defendants had access to the copyrighted work, or that Defendants' work is substantially similar to "any subject matter" protected by Plaintiff's copyright. [17] at 10–11; *see generally* [16], [17], [24]. The Court rejects both arguments.

### i. Access to Copyrighted Material

Because independent creation is a defense to copyright infringement, Plaintiff must first allege that Defendants had "access" or an actual opportunity to copy the original work. *Peters*, 692 F.3d at 633–34. Establishing "access" requires the Plaintiff to demonstrate "a reasonable possibility that the complaining work was available to the alleged infringer." *Selle v. Gibb*, 741 F.2d 896, 901–02 (7th Cir. 1984); *see also*

15

*Lexington Homes*, 858 F.3d at 1105 (explaining the access requirement is "not onerous").

The plaintiff may be able to introduce direct evidence of access when the work was sent directly to the defendant or a close associate of the defendant. *Selle*, 741 F.2d at 901; *Lexington Homes*, 858 F.3d at 1105; *see also, e.g.*, *Weller v. Flynn*, 312 F. Supp. 3d 706, 718 (N.D. Ill. 2018) ("Courts in this district have also sustained claims of access based upon a 'channel of communication' or a 'nexus' between the parties."); *Peters*, 692 F.3d at 634 (defendant closely collaborated with music producer who had copy of plaintiff's recording); *JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 913–15 (7th Cir. 2007) (officer of corporate defendant admitted that he saw and perhaps photographed plaintiff's doll and that doll gave him idea for accused work).

Here, ES3 alleges a direct channel by which the Defendants had the "opportunity" to copy the source code. *Peters,* 692 F.3d at 633. Plaintiff sent a copy of the MARS Source code directly to Defendant Dr. Cusatis, at his request, in June 2018, while he was still Plaintiff's employee. [1] ¶ 12. The source code was in Dr. Cusatis' possession until at least November 1, 2019. [1] ¶ 14. Sometime in or around 2019, after the code was in his possession, Dr. Cusatis purportedly began developing his own software program—the so-called MARS Derivative. *Id.* ¶¶ 15–18. Taken as true, Plaintiff's allegations plausibly allege that Dr. Cusatis had direct access to the source code for a period of at least one year, before or during the time he was developing the allegedly infringing software.

Defendants argue that Plaintiff cannot support an inference that Dr. Cusatis had access to the "2022 version" of the MARS Software at issue by alleging he had access to "one version of the MARS source code" from 2018 to 2019. [17] at 10–12. In other words, Defendants claim the MARS source code they had differs from the source code that is protected by the 2022 copyright registration. [24] at 10.

It is true that the "only copyrighted material that can properly be the subject of litigation is the material that is registered at the U.S. Copyright Office." [24] at 7–8 (citing *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 887 (2019)). It does not follow, however, that registration is a pre-condition of copyright protection. 17 U.S.C. §§ 408(a), 411(a). The Copyright Act safeguards copyright owners, regardless of registration, by vesting them with exclusive rights immediately upon creation of their works and prohibiting infringement from that point forward. *Fourth Est.*, 139 S. Ct. at 887 (citing *Eldred v. Ashcroft*, 537 U.S. 186, 195 (2003)). Upon registration, "a copyright owner can recover for infringement that occurred both *before* and after registration." *Id.* at 886–87, 891 (emphasis added); *cf. Pickett*, 207 F.3d at 404 (allowing defendant's counterclaim for copyright infringement occurring in 1993 even though he did not register his copyright until 1997).

A single copyright registration for a computer program protects all the copyrightable expression in the work, whether it be the underlying code, the text, or the screen displays. *See* 37 C.F.R. 202.3(b)(4) (recognizing registration of "all copyrightable elements that are otherwise recognizable as self-contained works"). The year of completion, in this case 2022, is "the latest year in which the creation of

17

*any* copyrightable element was completed," 37 C.F.R. § 202.3(c)(4). In fact, ES3 alleges that it developed the underlying code, text, and screen displays of the MARS Software over the course of two decades; ES3 thus plausibly claims copyright protection well before the 2022 registration date.

Although each version of a computer program that contains new, copyrightable authorship is considered a separate work, 17 U.S.C. § 101, versions representing "only a few minor changes or revisions to a preexisting work or making changes or revisions of a rote nature that are predetermined by the functional considerations of the hardware" may be covered by the same registration. U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 721.8 (3d ed. 2021); *see also Bruhn NewTech, Inc. v. United States*, 144 Fed. Cl. 755, 804–06 (2019) (declining to invalidate copyright in three versions of software registered together). As a result, Plaintiff has plausibly alleged that the "version" of the code Dr. Cusatis had access to from 2018 to 2019 remains protected by the Plaintiff's 2022 registration. Plaintiff's copyright certificate creates a presumption of its validity, and compliance with statutory requirements. 17 U.S.C. § 410(c). Plaintiff alleges the registered computer program and its source code was "written and improved over the course of 22 years." [1] ¶ 7. The Defendant had access to the source code after nineteen years of prior development and just a few years before the registration. As alleged, Plaintiff's complaint gives rise to an inference that, to the extent the 2022 version of the software differed from the versions available in 2018 and 2019, they differed only in nonsignificant ways.

Defendants also argue that Plaintiff's copyright protection remains limited because ES3 disclosed a portion of the MARS Software source code in the public domain. *See generally* [17], [24]. Certainly, a plaintiff has no right to prevent a defendant from using the parts of the work that are in the public domain. *Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 697 (N.D. Ill. 2004). But the fact that copyrighted work contains previously registered source code, or source code in the public domain, does not prevent Plaintiff from protecting its unique expression and compilation of that material. *See id.* (recognizing copyrights in original software with "even hundreds or thousands of lines" of previous source code).

Defendants argue that Plaintiff must identify the "specific portions" of the source code to which Dr. Cusatis had access and differentiate it from the source code that is in the public domain. [17] at 10–11; [24] at 7–8. But such specificity is not required at this stage. *See Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("specific facts are not necessary") (citing *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)); *Twombly*, 550 U.S. at 556 (explaining that Rule 8(a) "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence"); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). In *Carter v. Pallante*, the plaintiff claimed infringement, alleging that the defendants accessed the plaintiff's copyrighted songs and licensed them to third parties after the plaintiff revoked their rights. 256 F. Supp. 3d 791, 799 (N.D. Ill. 2017). The complaint failed to specify the third parties, the songs, or the timing of the license sales, and yet the court found the claim viable. *Id.* (citing *Mid America Title Co. v. Kirk*, 991 F.2d 417, 421 (7th Cir.

1993); *see also, e.g., Fergon Architects LLC v. Oakley Home Builders, Inc.,* 2014 WL 340035, at *2 (N.D. Ill. Jan. 30, 2014) (explaining "specific details as to each infringing act" are not required to "state a claim for copyright infringement"); *Golden v. Nadler Pritikin & Mirabelli*, 2010 WL 5373876, at *2 (N.D. Ill. Dec. 21, 2010). The Court declines to dismiss based upon any claimed lack of specificity.

### ii. Substantial Similarity to Copyrighted Work

To determine if two works are substantially similar, courts ask whether the accused work and the plaintiff's work are so similar that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression. *E.g., Lexington Homes*, 858 F.3d at 1101.

Substantial similarity is evaluated from the viewpoint of the work's intended audience. *Atari, Inc. v. North American Phillips Consumer Elecs. Corp.*, 672 F.2d 607, 618–19 (7th Cir.) *cert. denied*, 459 U.S. 880 (1982). The Court must make a qualitative judgment about the character of the work as a whole and the importance of the substantially similar portions of the work.[8] *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 565 n. 8 (1985). For example, video games, unlike artistic works, appeal to an audience who "would be disposed to overlook" many subtle

---

[8] District courts may make similarity determinations at the motion to dismiss stage by comparing the original work and infringing work. *See, e.g. Hobbs v. John*, 2012 WL 5342321, at *3 n.3 (N.D. Ill. Oct. 29, 2012), aff'd, 722 F.3d 1089 (7th Cir. 2013). But this is a much simpler task with song lyrics, *e.g., Peters*, 692 F.3d at 629, and farting dolls, *JCW Invs., Inc.*, 482 F.3d at 913, than highly technical computer source code. *Cf. Gentieu v. Tony Stone Images/Chicago, Inc.*, 255 F. Supp. 2d 838, 849 (N.D. Ill. 2003) ("Where as here the works are attached to the parties' submissions, the court may make a visual comparison of the images to determine as a matter of law whether they are substantially similar to copyrightable material." (citing *Theotokatos v. Sara Lee Personal Prods.*, 971 F.Supp. 332, 340–41 (N.D.Ill.1997)).

or minor differences in detail and "regard their aesthetic appeal as the same." *Atari*, 672 F.2d at 619.

Where the target audience for the work possesses specialized expertise relevant to the purchasing decision, some courts have held the substantial similarity inquiry must be done from the perspective of an objective observer with that specialized expertise. *Dawson v. Hinshaw Music Inc.*, 905 F.2d 731, 735–36 (4th Cir. 1990); *see also Kohus v. Mariol*, 328 F.3d 848, 857 (6th Cir. 2003); *Computer Assoc. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 713 (2d Cir. 1992); *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.,* 797 F.2d 1222, 1232–33 (3d Cir. 1986). Critically, the Copyright Act protects "the particular expression of an idea" found in a given work, but not the idea itself. 17 U.S.C. § 102(b). A "mathematical model" of a scientific phenomenon may not be copyrightable because it is simply describing and recording an existing reality. *Seng-Tiong Ho v. Taflove,* 648 F.3d 489, 498 (7th Cir. 2011). But the "arrangement, expression and manner of presentation" of such data can be protected by copyright, even if the data or equation is in the public domain. *Flick–Reedy Corp. v. Hydro–Line Manufacturing*, Co., 351 F.2d 546, 548 (7th Cir.1965). The distinction is one between creation and discovery. *Feist*, 499 U.S. at 347.

The protected expression in the MARS Software includes both its literal elements (that is, its source code), and its non-literal elements (its structure, sequence, organization, and user interface). *See Bucklew v. Hawkins, Ash, Baptie & Co., LLP.*, 329 F.3d 923, 926 (7th Cir. 2003) (recognizing copyrights in both construction and "display" of computer programs). Plaintiff may pursue infringement

by showing substantial similarity on both literal and non-literal elements of protected software. *See, e.g.*, *Midway Mfg. Co. v. Strohon*, 564 F. Supp. 741, 750 (N.D. Ill. 1983).[9]

When a customer purchases or uses computer software, he or she typically receives only the executable files, not the readable source code. *Computer Assocs.*, 333 F. Supp. 2d at 692. Naturally, source code[10] is often carefully guarded, and it may be necessary to rely upon "visual manifestation of the source code at issue"—to allege substantial similarity between the underlying source codes. *See Whelan*, 797 F.2d at 1244 (using similarities between video outputs to determine substantial similarity in underlying code); *Gay v. Facebook, Inc.*, 2016 WL 10650825, at *2 (N.D. Cal. 2016); *Digital Dream Labs, Inc. v. Living Tech*, 2023 WL 121750, at *3 (W.D. Pa. Jan. 6, 2023). *Cf. Computer Assocs. Int'l*, 333 F. Supp. 2d at 694 ("There does not appear to be any perfect way to compare millions of lines of source codes, especially in a case like this where the plaintiff's claim both literal and non-literal copying of the code.")

Defendants' use of their own software to produce visual simulations identical to those produced by MARS remains sufficient, at this stage of the proceedings, to show substantial similarities between the two programs, both in literal source code

---

[9] Defendants argue that Plaintiff's claim is limited to the "explicit source code (excluding that which is in the public domain) that was registered with the Copyright Office." [17] at 9. Nevertheless, it is copyright infringement to make or sell a derivative work without authorization, 17 U.S.C. § 106(2), even a derivative work with "a smidgeon of originality." *Bucklew*, 329 F.3d at 930 (citing *Pickett*, 207 F.3d at 405–07; *see also Computer Assocs. Int'l*, 982 F.2d at 701 (copyrights in literary works "cannot be limited literally to the text" (quoting *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir.1930), *cert. denied*, 282 U.S. 902 (1931)).

[10] Courts have defined source code as "the spelled-out program commands that humans can read." *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1355 (Fed. Cir. 2014) (citing *Lexmark Int'l, Inc. v. Static Control Components*, Inc., 387 F.3d 522, 533 (6th Cir. 2004)).

and in output. While the mathematical equations themselves may not be protectable, the MARS software allegedly generates visual expressions and models of the mechanical response of structures under various loading conditions [1] ¶ 7. Defendants claim that in a matter of months they independently developed a software program that mirrored the visual output and capabilities of the MARS Software developed over the course of decades. ES3 alleges that Cusatis was also able to generate "a figure depicting a compression simulation with high-strength aggregate and low-strength binder," a simulation which could not have been made without the use of the MARS source code, *Id.* [1] ¶¶ 18–19; and there is no equivalent or alternative software on the market with similar modeling capabilities. [1-3]. These allegations plausibly suggest that both software programs share an identical and unique functionality, either due to similarities in their underlying codes or their structure and organization. Questions about whether Defendants independently created the software remain inappropriate now and must be addressed on a more developed factual record.

Defendants argue that Plaintiff must identify what portion of its copyrighted source code is substantially similar and could produce Figure 10. [17] at 14. Not so. Complaints for copyright infringement "simply alleging present ownership by plaintiff, registration in compliance with the applicable statute, and infringement by defendant, have been held sufficient under the rules." *Mid Am. Title Co.,* 991 F.2d at 421–22 (citing 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1237). This complaint gives enough details to present "a story that holds

23

together." *Swanson*, 614 F.3d at 404. ES3 registered its copyright in the MARS Software in 2022, although the software has been developed over the course of two decades. Plaintiff sent a copy of the protected source code directly to then-employee Defendant Dr. Cusatis in 2018, who had the code in his possession until November 2019. When the source code was already in his possession, he developed a software that mirrored the unique functions of the MARS Software in a fraction of the time it took to develop MARS. Taking these allegations as true, Plaintiff has plausibly alleged Defendants' software constitutes an unauthorized derivative of ES3's copyright. Plaintiff may proceed on its copyright infringement claim.

### 2. Counts II, III & IV: Trade Secrets

Defendants also seek to dismiss ES3's trade secret misappropriation claims, arguing that ES3 has failed to state a claim upon which relief may be granted under the Defend Trade Secrets Act or under Illinois or California state law.

To state a claim for violation of the DTSA, a plaintiff must first allege facts sufficient to provide notice that the relevant information constitutes a trade secret. 18 U.S.C. § 1836(b)(1). But a plaintiff must only plead the existence of trade secrets in broad strokes to survive a motion to dismiss. *See Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1065–66 (N.D. Ill. 2020) ("Courts have found allegations to be adequate in instances where the information and the efforts to maintain its confidentiality are described in general terms") (citing *Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp.3d 813, 818 (N.D. Ill. 2014)); *see also Mission Measurement Corp. v. Blackbaud, Inc.,* 216 F. Supp. 3d 915, 921 (N.D. Ill. 2016).

Once a plaintiff adequately pleads the existence of a trade secret, it then must sufficiently allege that the defendant misappropriated the trade secret within the meaning of § 1836(b)(1). *Croner*, 419 F. Supp. 3d at 1065–66. The DTSA defines "misappropriation" as:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who--(i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--(I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that—(I) the trade secret was a trade secret; and (II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839 (5).

The DTSA further defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means" but the DTSA specifically excludes from this definition "reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

A plaintiff alleging a violation of the Illinois Trade Secrets Act (ITSA) must show: (1) the presence of a trade secret; (2) that was misappropriated; and (3) that the defendant used the trade secret in its business. *Composite Marine Propellers, Inc.*

25

*v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992). This analysis contains the same two elements required to show a violation of the DTSA, plus an added element: use in business, making a combined analysis appropriate. *Croner*, 419 F. Supp. 3d at 1071; *see Aon Risk Serv. Co., Inc. v. Alliant Ins. Servs., Inc.*, 415 F.Supp.3d 843, 847–48 (N.D. Ill. 2019) (analyzing DTSA and ITSA claims together because the relevant definitions overlap).

Similarly, courts analyze claims brought under the DTSA and California Uniform Trade Secrets Act (CUTSA) together. *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020); Cal. Civ. Code § 3426. The DTSA and CUTSA also "share the same pleading requirements for the identification of trade secrets." *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 880–81 (N.D. Cal. 2018); *Beluca Ventures LLC v. Einride Aktiebolag*, 660 F. Supp. 3d 898, 907 (N.D. Cal. 2023).

### a. Existence of Trade Secrets

Defendants first argue that ES3's Complaint fails to identify a trade secret. The DTSA defines "trade secret" to mean: "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." 18 U.S.C. § 1839(3).

Trade secrets are protected if: "(A) the owner thereof has taken reasonable

measures to keep such information secret; and (B) the information derives "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.*

Here, ES3 alleges the existence of trade secrets in the MARS Software source code and "a large set of unique models, methods, algorithms, procedures, etc. (features) which perform a variety of functions and capabilities" for the MARS Software [1] ¶¶ 7–8, 8 n.1; [23] at 5. These protected "features," in the MARS Software include: (1) analytical formulations for modeling beam and shell finite element, discrete macro-particles, interaction models between different components; (2) advanced built-in pre- and post-processors for generating models and post-processing simulation results in formats that can be used to make three-dimensional renderings; (3) unique numerical approaches for neighborhood searches used in contact detection algorithms; (4) numerical algorithms and procedures that implement Message Passing Interface (MPI) parallelization, which makes it possible to simulate very large problems on massively parallel supercomputer centers; (5) modular implementation of a Graphical User Interface (GUI); (6) a unique procedure to automatically determine the best model parameters using experimental data; and (7) implementation of a GCode interface for generating analytical models of components to be simulated. *See* [1] n. 1 (details of these features have not been published).

Defendants argue that this "vague list of technology features" is "broad enough

to attempt to claim anything and everything at its company is a trade secret." [17]. But DTSA does not impose a heightened pleading requirement. *Cf. Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002). For present purposes, ES3 must simply allege the existence of secret methodologies or processes and must identify them with enough specificity to satisfy the above standards. Trade secrets "need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a requirement would result in public disclosure of the purported trade secrets." *Sonrai Sys., LLC v. Waste Connections, Inc.*, 658 F. Supp. 3d 604, 614 (N.D. Ill. 2023) (quoting *AutoMed Techs., Inc. v. Eller,* 160 F. Supp. 2d 915, 921 (N.D. Ill. 2001)).

Here, rather than relying on "broad areas of technology," *Composite Marine Propellers, Inc.*, 962 F.2d at 1266, Plaintiff's complaint identifies specific methods processes, and models within the MARS Software. These allegations provide as much (and in many cases more) specific information as other claims that have been allowed to proceed. *See, e.g., AutoMed Techs., Inc.*, 160 F. Supp. 2d at 921 (allowing plaintiff's amended complaint to continue after it "specifies Staffing Simulation software and the source code for PPS software as trade secrets" in addition to "generic references" to three research projects); *Papa Johns Int'l Inc. v. Rezko,* 446 F. Supp. 2d 801, 812 (N.D. Ill. 2006) (allowing plaintiffs' ITSA claim to proceed although it is "unclear which trade secrets of the 'Papa John's System' were misappropriated" because "the allegations satisfy the liberal pleading standards").

To show that the identified information is a trade secret, ES3 must also

demonstrate that such information is valuable, not known to others who might profit by its use, and that it has been handled by means reasonably designed to maintain secrecy. The complaint does so here.

For example, ES3 has alleged the MARS Software "has significant value" because it facilitates the solution of specific mechanical engineering problems and assists Plaintiff in performing research and development projects, including projects under contracts awarded by the U.S. Army Engineer Research and Development Center (ERDC). *Id.* ¶¶7–8. Indeed, according to an email attached to the complaint, Dr. Cusatis recognized the MARS Software's potential economic value when he proposed a licensing agreement in the MARS Software for commercial use and subsequent transfer of ownership—a proposal ES3 ultimately rejected. [1] ¶ 11; [1-3] at 7. Dr. Cusatis' admission that "MARS, if properly and aggressively marketed, could have a chance as a commercial code (especially in academic environments)" demonstrates the trade secrets' economic value. *Id.*

The complaint also lists several specific measures ES3 used to protect the MARS trade secrets, including: (1) using agreements containing nondisclosure provisions or restrictive covenants with employees and individuals who were given access to the trade secrets; (2) limiting access to the trade secrets to only those employees and individuals; (3) using data encryption and password protection to control access; and (4) omitting the portions of the source code containing the trade secrets in the material deposited with the United States Copyright Office. [1] ¶¶ 8. Plaintiff attaches Dr. Cusatis' signed copy of the Confidentiality and Non-

29

Competition Agreement to its complaint. *Id.*¶¶ 8, 10, 12; [1-2] at 2.

Finally, ES3 has alleged the trade secrets are "not generally known" or "readily ascertainable through proper means" by "anyone who can obtain economic value" from the disclosure or use of the information. [1] ¶ 8. Defendants challenge this point because ES3 "made no attempt to separate what is in the public domain from that which may not be publicly known," [17] at 16. But, at this stage, the Court accepts plaintiff's well supported allegation as true. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). Dr. Cusatis and CCS may raise the issue on a fully developed record at the summary judgement stage. Ultimately, whether information constitutes a trade secret, or a generally known method or procedure, is an issue of fact best "resolved by a fact finder after full presentation of evidence from each side." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. Cir. 2003) (quoting *Lear Siegler, Inc. v. Ark–Ell Springs, Inc.*, 569 F.2d 286, 289 (5th Cir. 1978)). At this stage, Plaintiff's allegations suffice.

### b. Misappropriation of Trade Secrets

Defendants argue that ES3's allegations do not demonstrate trade secret misappropriation. Most of their arguments here echo their arguments on previous counts in that they challenge the Complaint's specificity in describing infringing acts. Specifically, Defendants argue that because Plaintiff's misappropriation allegation is "based on" Defendants' publication of "at least two articles with the ASCE," the Complaint must identify the publications and Articles, and specify the confidential

information they contain. [17] at 17 (quoting [1] ¶ 22).[11]    But, again, a complaint need not "allege all, or any, of the facts logically entailed by the claim," and it certainly need not include evidence.  *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998) (quoting *Am. Nurses' Ass'n v. Illinois*, 783 F.2d 716, 727 (7th Cir. 1986)); *see also Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 714 (7th Cir. 2006) ("Federal complaints plead claims rather than facts."); *Tamayo*, 526 F.3d at 1081.

In any event, ES3 does not merely allege misappropriation based upon the unauthorized disclosure of the trade secrets through the cited articles.  Under the DTSA a plaintiff may show misappropriation by alleging: (1) disclosure without consent; (2) use without consent; or (3) acquisition by "improper means," including "breach of a duty to maintain secrecy."  *See* 18 U.S.C. § 1839 (5), (6); *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1065–67 (N.D. Ill. 2020).  ES3 sufficiently alleges misappropriation through unauthorized use, both through using portions of Plaintiff's source code to develop a "knock off" software program, and by using that software to publish articles and a progress report (among other anticipated uses) without consent or authorization, in violation of Cusatis' Confidentiality Agreement. [1] ¶ 17.  And ES3 also sufficiently alleges unauthorized disclosure based upon the articles published for the American Society of Civil Engineers. [1] ¶ 22. ES3 provided Cusatis with the trade secrets he used to draft those published works while Cusatis worked for ES3 and remained bound by the Confidentiality Agreement, and yet

---

[11] Again, Defendants do not identify controlling authority (or any authority) requiring this level of specificity in misappropriation claims, beyond generic labeling as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

Cusatis published them without following ES3's "specific protocols." *Id.*; [23] at 6. Plaintiff may proceed on its trade secret misappropriation claims.

### 3.    Count V:  Breach of Contract

Defendants next move to dismiss Count V of the Complaint, which alleges breach of contract.  Defendants first raise a specificity argument, and, for the reasons explained above, the Court rejects that argument.

Defendants also argue that the Confidentiality Agreement remains facially invalid because it contains a non-compete provision,[12] which is prohibited under California law. [17] at 13; *see* CAL. BUS. & PROF. CODE § 16600 (providing a "contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void").

Section 16600 invalidates certain *provisions*[13] in employment contracts if they prohibit an employee from working for a competitor after completion of his employment or imposing a penalty if he does so, unless such restrictions are necessary to protect the employer's trade secrets.  *See Retirement Grp. v. Galante*, 176 Cal. App. 4th 1226, 1237–38 (2009) (collecting cases).  For example, former employees may be barred from soliciting existing customers to redirect their business

---

[12] The Agreement, attached to the Complaint, provides: "I agree that for One (1) year from  after termination of my employment, for any reason, unless acting with the Company's express prior written consent, I shall not, directly or indirectly, in any capacity, solicit or accept business from, provide consulting services of any kind to, or perform any of the services offered by the Company, for any of the Company's customers or prospects with whom I had business dealings in the year preceding the termination of my employment."  *See* [1-2].

[13] *See, e.g.*, *Winston Research Corp. v. Minnesota Mining & Mfg. Co.*, 350 F.2d 134, 140, n.4 (9th Cir. 1965) (explaining that although employment agreement contained invalid noncompetition provision, "under California law the void provision was severable and the remainder of the contract fully enforceable").

away from the former employer and to the employee's new business, if the employee is using trade secret information to solicit those customers. *See, e.g., Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1338 (9th Cir.1980) (explaining under California law "the employer will be able to restrain by contract only that conduct of the former employee that would have been subject to judicial restraint under the law of unfair competition, absent the contract"); *Edwards v. Arthur Andersen LLP*, 189 P.3d 285, 291 n. 4 (2008) ("We do not here address the applicability of the so-called trade secret exception to section 16600 . . .").

The contractual provision Plaintiff invokes protects its confidential information and trade secrets, [1-2] at 3. As a result, the breach of contract claim remains viable.

### 4. Cusatis Computational Services

Finally, because ES3's complaint asserts all claims against both Defendants, CCS separately argues that the claims against it should be dismissed because wES3 failed to allege facts about the specific role CCS played in any of the alleged misconduct. [17] at 19. But Plaintiff alleges that each of the Defendants "was the agent, and employee of, and acted for and on behalf of, each of its co-defendants herein within the scope of his or its authority or agency." [1] ¶ 4. This allegation suffices at this stage with respect to ES3's copyright infringement and trade secret misappropriation claims. *See Restoration Specialists, LLC v. Hartford Fire Ins. Co.*, No. 8-CV-644, 2009 WL 3147481, at *3 (N.D. Ill. Sept. 29, 2009) ("The question of agency typically presents an issue of fact that seldom can be resolved at the summary judgment stage,

much less on a motion to dismiss"). The Court grants CCS' motion with respect to ES3's breach of contract claim, however, because CCS never executed any contract with ES3; only Dr. Cusatis signed the confidentiality agreement. *See, e.g.*, *Northbound Grp., Inc. v. Norvax, Inc.,* 795 F.3d 647, 650 (7th Cir. 2015)("It goes without saying that a contract cannot bind a nonparty."); *Cima v. WellPoint Health Networks, Inc.,* 556 F. Supp. 2d 901, 905 (S.D. Ill. 2008) ("Under Illinois law, as a general rule a non-party to a contract cannot be liable for a breach of the contract") (citing *Credit Gen. Ins. Co. v. Midwest Indem. Corp.*, 916 F.Supp. 766, 772 (N.D.Ill.1996); *Santella v. Grishaber*, 672 F.Supp. 321, 328 (N.D.Ill.1987); *Meeker v. Gray*, 492 N.E.2d 508, 515 (Ill. App. Ct. 1986)). And the complaint provides no other factual or legal basis to impose liability on CCS for Cusatis' alleged breach.

**D.  Conclusion**

For the reasons explained above, the Court grants in part, and denies in part, Defendants' motion to dismiss [16]. The Court dismisses Count V as to CCS only; the motion is denied in all other respects.

Dated:  March 29, 2024

Entered:

John Robert Blakey
United States District Judge